# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

MARCUS CHURCH  #350091,       )
           )
      Petitioner,         )
           )
v.                   )      **NO.  3:16-cv-00726**
           )      **JUDGE CRENSHAW**
CHERRY LINDAMOOD,      )
           )
      Respondent.       )

## MEMORANDUM

Petitioner Marcus Church, a state prisoner serving an effective sentence of 25 years for one count each of aggravated robbery and especially aggravated kidnapping, has filed a *pro se* petition under 28 U.S.C. § 2254 for the writ of habeas corpus. (Doc. No. 1.)  Respondent has filed an answer, along with a copy of portions of the state court record. (Doc. Nos. 16, 17.)  For the reasons set forth below, the Petition will be denied.

## I.      BACKGROUND AND PROCEDURAL HISTORY

A Davidson County jury convicted Petitioner on February 9, 2011, of one count of aggravated robbery and one count of especially aggravated kidnapping. (Doc. No. 16-19, at 72–73.)  The trial court sentenced Petitioner to 15 and 25 years for the counts, respectively, to be served concurrently for a total effective sentence of 25 years. (Doc. No. 16-19, at 72–73.)  The Tennessee Court of Criminal Appeals ("Criminal Appeals Court") affirmed the convictions and sentences on June 10, 2013. (Doc. No. 16-16); State v. Church, No. M2011-01770-CCA-R3-CD, 2013 WL 2641338 (Tenn. Ct. Crim. App. June 10, 2013), appeal denied (Tenn. Nov. 13, 2013). The Tennessee Supreme Court denied Petitioner's application to appeal on November 13, 2013. Id.

On March 28, 2014, Petitioner filed a *pro se* petition for post-conviction relief (Doc. No.

16-19, at 38–45), which was followed by the appointment of counsel and the filing of an amended petition on October 21, 2014. (Doc. No. 16-19, at 50–55.) The trial court held a hearing on October 23, 2014, and denied relief on November 4, 2014. (Doc. No. 16-19, at 60–66.) The Criminal Appeals Court affirmed on August 11, 2015, and the Tennessee Supreme Court again denied permission to appeal on October 15, 2015. (Doc. No. 16-24); <u>Church v. State</u>, No. M2014-02342-CCA-R3-PC, 2015 WL 4737430 (Tenn. Ct. Crim. App. Aug. 11, 2015), <u>appeal denied</u> (Tenn. Oct. 15, 2015).

Petitioner filed his *pro se* Petition under 28 U.S.C. § 2254 in this Court on April 12, 2016, and Respondent acknowledges that it is timely. (Doc. No. 17, at 2.)

## II.  STATEMENT OF FACTS

The Criminal Appeals Court summarized the facts of the case on direct appeal as follows:

On the evening before March 31, 2008, the victim, Byron Brandon, had been at his girlfriend's house in North Nashville drinking beer and using cocaine. After being at the house five or six hours, he eventually left in his light blue Jaguar. On his way back home to Hayes Manor, the victim drove down Jefferson Street and pulled into the parking lot of Paul's Market because he was low on gas. He thought that he pulled in at approximately 1:00 a.m. The victim then decided not to get gas at the market because there were "too many people for [him] to stop. [He] just didn't feel comfortable." As the victim was stopped waiting for traffic to clear so he could pull out, a man approached the victim's open window with a gun and said, "All right, we got ya." The man, later identified as Defendant, got in the passenger side of the victim's car, pointed the gun at the victim, and demanded his ATM card. Defendant then asked about the victim's money, and the victim told Defendant that he had four or five dollars in his pocket; however, the victim actually had twenty-dollars that he planned to use to buy gas.

The victim testified that Defendant then said, "Well, I want you to drive where I want you to go." The victim thought that he would be killed or robbed. He said that he began driving while Defendant pointed the gun at him and said, "I got you. What you going to do." After the victim drove past Hadley Park, Defendant told him to drive into an alley. After he pulled into the alley and stopped the car, Defendant directed the victim to turn the car off and hand him the keys. He then told the victim to open the trunk and climb inside. Defendant got back into the car and began driving around.

The victim estimated that he was in the trunk for at least four or five hours, and at

some point, he heard multiple people talking outside the car. The victim testified that he eventually pulled an access latch in the truck and crawled into the backseat of the passenger compartment. Defendant then ordered him back into the trunk and hit him on the head with the gun causing him to bleed. The victim crawled back into the trunk, and Defendant continued driving. Once the victim got back into the trunk he had no "idea" how long he was inside, "but [he] [knew] it had to be a while because it was dark." The victim testified that he was able to communicate with Defendant through the trunk. He said that Defendant told him, "you might as well do what I am telling you to do cuz [sic] it is over anyway." The victim attempted to pull the latch a second time but the seat had been secured with "shoestrings" and would not fall down. The victim testified that the car eventually stopped, and he heard a female voice. He said, "She was just kind of curious of where he got the car." The victim testified that the car stopped again, and Defendant finally released him from the trunk somewhere in North Nashville and said, "All right. You can go now." The victim testified that Defendant walked off with his cell phone, wallet, license, money, and "everything."

The victim testified that he climbed out of the trunk and drove home to his mother's house. He spoke with his mother and then called 911. Police arrived, and he was later taken by ambulance to Meharry Hospital where he received three stitches for a cut on his elbow. The victim later spoke with a detective who showed him a photographic line-up. He identified a photograph of Defendant as the person who committed the offenses. The victim testified that there were blood spots on the trunk, bumper, side panel, and driver's seat of his car that came from the cut to his elbow. The victim testified that he worked twenty-eight years for the Ford Motor Company until he had a stroke. He had been disabled for ten years due to the stroke, which caused him problems with walking and memory.

On cross-examination, the victim was extensively cross-examined about various inconsistencies between his trial testimony, his testimony at the 2010 trial that ended in a mistrial, and his statements to police. The victim admitted that he "had a struggle with cocaine." However, he said that it did not affect his perception on the night of the offenses. The victim testified that he arrived at his girlfriend's house at approximately 5:00 p.m. on March 30, 2008, and he left at approximately 12:00 a.m. on March 31, 2008. He said that Defendant had cocaine with him when he got into the victim's car, and he showed it to the victim. The victim testified that the cocaine remained in Defendant's lap while Defendant was holding the gun, and the victim was driving. The victim said: "I am telling the jury that I was forced into driving where I—where he told me to drive, said that if I got here 'I can give you this if you want it.' "He said that Defendant offered the cocaine as a bribe, but at the same time he was pointing the gun at the victim saying, "I got ya." The victim admitted that he may not have mentioned the cocaine to officers or in any of his previous testimony. He did not recall the exact time that he stopped at Paul's Market, but said that he arrived home at approximately 3:00 a.m.

The victim testified that while he was in the trunk, Defendant stopped to get gas using some of the victim's money. He said that Defendant took money from his pocket and from the glove compartment of the car. The victim had not previously

mentioned those details to anyone. He testified that he did not know anyone at Paul's Market and did not know that it was a place where people bought drugs. The victim testified that some women at the market asked him for a ride, and he said, "No." He said that a man then got into his car, then got out, and handed a gun to Defendant and said, "All right. You do it." The victim testified that he did not mention the second man to Officer Herndon or Detective Brennan when he spoke with them. He told Officer Herndon that Defendant approached him and said that he liked the victim's car and wanted to drive it. Defendant then got into the car after the victim said that he could not drive it.

The victim testified that it was dark when he was released from the trunk; however, he acknowledged previously testifying that it was daylight when he was released. The victim further testified that Defendant exited a green Cadillac at Paul's Market, but he did not see the car when he was released. On the date of the offenses, the victim admitted that he did not tell medical personnel that he had been drinking alcohol or using drugs. He further did not tell Officer Herndon or Detective Brennan that he had used drugs or that Defendant had showed him some cocaine.

Officer Daniel Herndon testified that he responded to a call at 712 Rowan Drive at approximately 9:00 p.m. He spoke with the victim and the victim's mother, Dorothy Brandon. The victim had abrasions to his forehead and right arm, and there was a gash on his right elbow. Officer Herndon called an ambulance due to the severity of the victim's injuries. He testified that the victim was coherent and seemed very exhausted. The victim provided a physical description of the person who kidnapped him and a description of the weapon used. Officer Herndon observed blood on the back of, and inside, the victim's car.

On cross-examination, Officer Herndon testified that the victim told him that the encounter began at approximately 2:00 a.m. at Paul's Market. Officer Herndon described Paul's Market as a high crime area. The victim did not mention that he had been using drugs or that Defendant showed drugs to him while in the car. The victim also did not say that Defendant offered him drugs in exchange for a ride. Officer Herndon testified that the victim indicated that he was released from the trunk at approximately 6:30 p.m.

According to the victim, the incident lasted eighteen hours. The victim told Officer Herndon that one person got into the car at Paul's Market, and there were others in the car later. The victim described his kidnapper as being a black male, 5′4″ with black hair, and long sideburns. Officer Herndon did not recall the victim mentioning a hat. The victim said that he was hit on the head with a gun when Defendant opened the trunk to get CDs. Officer Herndon said that he would have made notes if the victim had mentioned multiple assaults. The victim told him that he saw Defendant get into a green Cadillac after the victim got out of the trunk. The victim also said that he was let out of the trunk at 21st Avenue and Buchanan Street, not in an open field.

Dorothy Brandon, the victim's mother, testified that she was at home on March 31, 2008, when the victim returned home. She said that the victim was bleeding and indicated that someone held him with a gun at Paul's "filling station." Ms. Brandon

testified that they waited a few minutes and then called 911. She saw blood "all over" the victim's car and in the trunk. Ms. Brandon testified that the victim had been "a little slow" since suffering a stroke.

Officer Lynette Mace, of the Metro Police Department Technical Investigation Section ID Unit, testified that she processed the victim's car for fingerprints. She said that the vehicle had a significant amount of blood in the trunk, outside of the car, and on the driver's seat. Officer Mace developed some latent fingerprints on the trunk lid, exterior driver's door, the exterior right front door, and the area behind the right rear door of the vehicle. She also found a prescription bottle in the vehicle belonging to Anissa Watkins. Officer Linda Wilson, of the Metro Police Department Identification Division maintained latent print files and was an expert in fingerprint analysis. She examined the prints lifted in the present case and testified that a right palm print from the victim's car was identified as belonging to Defendant. Other prints taken did not match anyone in the AFIS System.

Anissa Watkins testified that she was at a Circle K convenience store near Tennessee State University mid-day on March 31, 2008. Ms. Watkins had walked inside the store to inquire about the air machine, and as she was walking out, she saw a man reaching into her car. The man pulled her purse out, got into a light blue Jaguar, and sped away. Ms. Watkins testified that her purse contained a prescription, ruby and diamond earrings, a credit card, and her driver's license. The man who took her purse appeared to be in his 20's, and she thought there were two people on the front seat. She also testified that there could have been others in the car.

Everett Brewer testified that he was incarcerated on a federal firearms charge. He had signed papers for a plea agreement, but had not yet been sentenced. Mr. Brewer testified that he faced a sentence of 180 to 200 months. As part of his plea, he agreed to cooperate on certain other cases. Mr. Brewer testified that as a result of his cooperation, three individuals had been arrested and convicted. Mr. Brewer testified that his testimony had to be truthful or he would face the maximum penalty under federal law. He acknowledged that he had several prior convictions.

Mr. Brewer testified that he met Defendant while incarcerated at the Criminal Justice Center when Defendant was a third shift "rock man" or trustee. He and Defendant were eventually moved into the same "pod" but they did not share a cell. Mr. Brewer testified that he became a trustee, and he and Defendant "became even closer." He said that they discussed Defendant's case. Mr. Brewer testified:

> One particular night he was telling me about, well, he kept asking me, you know, did I think that, you know, that if he could beat his charge and I told him, you know, only he knew that, only he knew what he had done and one night we were sitting in the little room and he got to talking to me and just kind of telling me, he told me, you know, some specifics on that particular night.

> He told me that he had been doing powder cocaine and then when the cocaine and the money ran out that he went to a—I want to say a convenience store gas station that he was looking for somebody

slipping, he said, that uh you know a lot of the little drug dealers were known to come to frequent that store and a lot of them had a tendency to pull up and get out of their cars and leave the vehicle running and left an opportunity for him to jump in the vehicle and take off, you know, strip the car for the rims, stereo system, whatever he could get out of it and he told me that while he was hanging out around the store that he ran in—he encountered an individual and he didn't tell me, you know, how he got [up on] the individual but he told me that he encountered the individual and that had took him at gun point, that they had left the store, and that he had took the individual and put him in the trunk of his car of the individual's car that he had taken and that they were riding around-that he was riding around, driving around in the individual's car and at some point after he had put the individual in the trunk he had heard a noise or happened to look in the rearview mirror and noticed that the individual had, uh, had come from the trunk, was coming through the backseat, that somehow he had managed to maneuver the seat so he could come through there.

He told me that the pistol that he had laying on his lap that he kind of slowed down turned around and pointed the gun at the individual and when he wouldn't get, when the individual kept trying to come back he hit him a couple of times in the face or head area and pointed the gun at him again and made him get back and the individual retreated back into the trunk.

Shortly after he said that he pulled over and kind of fixed the seat back and then sometime after that that he was riding around and picked up a couple of his homeboys is what he said and I told him that, I made the statement that he was lucky that they didn't call his name, you know, say his name and said that they were calling him by his nickname which was Rell, that they never mentioned his real name, that they only said Rell.

They had rode around for a while getting high, snorting cocaine and eventually he dropped those two individuals off and went back to where he had his, in the vicinity of where he had his car parked, and said that after he had got out of the car that he had dropped the trunk where the individual was locked up at and proceeded to walk and got in his car and he left the individual.

Mr. Brewer testified that Defendant indicated that he had been driving a Cadillac.

Mr. Brewer testified that he did not discuss Defendant's case with anyone else, and Defendant had only shown him a document indicating that the victim had contradicted himself. He said that he had helped Defendant re-write two letters to his attorney.

On cross-examination, Mr. Brewer testified that Defendant would ask him questions about certain things because he "had been to the penitentiary and [he] had

studied some law." Mr. Brewer testified that he and Defendant did not discuss the State's witnesses or their testimony, and Defendant felt that the State did not have a strong case. He said that Defendant never showed him discovery from the case, and he did not view any police reports or the warrant in Defendant's case. Mr. Brewer agreed that he testified against Defendant in order to "somewhat" help himself, and there was a possibility that the federal prosecutor would recommend a lesser sentence in his case.

Detective Christopher Brennan of the Metro Police Department testified that he was assigned to investigate the present case. After receiving the report of the kidnapping and robbery, Detective Brennan called the victim to review his side of the story to see if it matched the officer's report. He also stopped by Paul's Market to see if there was any video surveillance, but the store did not have surveillance tapes. Detective Brennan testified:

> Then two nights later I received an email from the latent print section saying that they had received a fingerprint hit on the fingerprints that the crime scene officer lifted from [the victim's] vehicle. I was able to run that name through our nickname database that is entered when people are arrested, if they have a nickname it goes in a database that we keep.

> The nickname that [the victim] had thought that he had heard the suspect called while he was in the trunk of the car matched the nickname that the defendant had used previously at one point in time, the nickname of Rell.

> At that point I put together a photo line-up and called [the victim] on the, I believe it was on the 7th and took that out and showed that to him where he positively identified the defendant as the person who committed the crime against him. At that point I took warrants out on the defendant.

Detective Brennan testified that within approximately twenty seconds after viewing the photographic line-up, the victim identified Defendant as the person who robbed and kidnapped him. The victim also indicated that he was one-hundred percent sure of his identification. Detective Brennan then went to night court and obtained warrants on Defendant.

On cross-examination, Detective Brennan testified that it was his understanding that the offenses began at 1800 Jefferson Street. He said that the area was a high traffic and high crime area. Detective Brennan testified that he was familiar with the term "crack pawn." He explained that it was a term "generally labeled as a person doesn't have enough cash or any money to buy drugs so they will trade whatever they have be it jewelry, vehicles, anything of that sort."

Detective Brennan testified that the victim indicated that the incident began at approximately 2:00 a.m., and he was freed from the trunk at approximately 6:30 p.m. The victim told him that one person, not two, got into the car with him at Paul's Market. Detective Brennan testified that the victim described Defendant as being a

5′4″ black male with long, dark sideburns, and black hair. He said the victim indicated that he received a head injury when Defendant opened the trunk to change the CD, not after he attempted to crawl into the passenger compartment from the truck of the car. Detective Brennan testified that although the victim did not mention anything about a Cadillac to him, it was listed in Officer Herndon's report. Officer Herndon's report also indicated that the victim attempted to escape from the trunk through the back seat and that the seat was pushed back and the seat belts were buckled to prevent a further attempt at escape. The victim told Detective Brennan that he was released from the trunk near 21st Avenue and Buchanan Streets, not in an open field. Detective Brennan testified that the victim did not mention that Defendant had shown him drugs or offered drugs in exchange for a ride.

Hugh Coleman, an investigator with the Davidson County District Attorney's Office, testified that he determined that Defendant had a MySpace account, and he subpoenaed the records from the account. Mr. Coleman testified that the nickname on Defendant's MySpace account was "Rell." He identified a printout of the subscriber information and user number for Defendant's MySpace account. Mr. Coleman also identified a message from "Rell" that was sent from Defendant's account, and there was a photograph posted on the page. On cross-examination, Mr. Coleman testified that none of the pictures on Defendant's MySpace page showed Defendant with hair or sideburns.

State v. Church, 2013 WL 2641338, at *2–7.

## III.    ISSUES PRESENTED FOR REVIEW

Petitioner asserts the following claims for relief:

1. Trial counsel was ineffective in the following respects:

   a. For failing to file a motion for production of the statements of the witnesses testifying for the State;

   b. For failing to move for mistrial or dismissal because the State allowed the victim to testify falsely;

   c. For failing to seek funds to retain a fingerprint expert;

   d. For failing to preserve a claim that there was insufficient evidence to support Petitioner's conviction on either count; and

   e. For failing to renew a motion to suppress the victim's identification of Petitioner in light of the victim's conflicting descriptions of the perpetrator.

2. The State withheld the victim's statement to police, in violation of Brady v. Maryland, 373 U.S. 83 (1963), and allowed the victim to testify falsely to convict Petitioner.

(Doc. No. 1, at 5–6.)

## IV. STANDARD OF REVIEW

### A. AEDPA Review on the Merits

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Peterson v. Warren, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" Woodford v. Garceau, 538 U.S. 202, 206 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." Uttecht v. Brown, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102–03 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)).

### B. Exhaustion and Procedural Default

#### 1. Exhaustion

28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas

corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim to the state courts. Cullen v. Pinholster, 563 U.S. 170, 182 (2011). This rule has been interpreted by the Supreme Court as one of total exhaustion. Rose v. Lundy, 455 U.S. 509 (1982). Thus, each and every claim set forth in a federal habeas corpus petition must have been presented to the state appellate court. Picard v. Connor, 404 U.S. 270 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented to the state courts as a federal constitutional claim, Gray v. Netherland, 518 U.S. 152, 162–63 (1996); Koontz v. Glossa, 731 F.2d 365, 369 (6th Cir. 1984), and under the same legal theory in which it is later presented in federal court. Wong v. Money, 142 F.3d 313, 322 (6th Cir. 1998). Fair presentation requires that the state courts be given the opportunity to see both the factual and legal basis for each claim. Wagner v. Smith, 581 F.3d 410, 414 (6th Cir. 2009).

### 2. *Procedural Default*

The procedural default doctrine is ancillary to the exhaustion requirement. See Edwards v. Carpenter, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 81–82 (1977); see also Walker v. Martin, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); Coleman v. Thompson, 501 U.S. 722 (1991) (same).[1] If a claim has

---

[1] "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." Walker, 562 U.S. at 315. A state rule is an "adequate" procedural ground if it is "firmly

never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 731–32; see also Hicks v. Straub, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine).

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." Coleman, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999) (citing Coleman, 501 U.S. at 754).

"'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him [;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." Coleman, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." Id.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)); see also Ambrose v. Booker, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice

---

established and regularly followed." Id. (quoting Beard v. Kindler, 558 U.S. 53, 60–61 (2009)). "A discretionary state procedural rule ... can serve as an adequate ground to bar federal habeas review ... even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." Id. at 1128 (quoting Kindler, 558 U.S. at 60–61) (internal citations & quotation marks omitted).

to excuse their default").

"When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial. See United States v. Frady, 456 U.S. 152, 168 (1982) ("In applying this dual [cause and actual prejudice] standard to the case before us, we find it unnecessary to determine whether Frady has shown cause, because we are confident he suffered no actual prejudice . . ..").

## V.     ANALYSIS AND DISCUSSION

### A.     Claim 1

Petitioner's first claim consists of five distinct assertions of ineffective assistance of trial counsel. (Doc. No. 1, at 5.)  None of those assertions was presented on direct appeal, see State v. Church, 2013 WL 2641338, at *1, or in the amended post-conviction petition filed by his appointed counsel, which purported to advance "all non-frivolous Constitutional grounds warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." (Doc. No. 16-19, at 50–55.)  This entire claim is therefore procedurally defaulted.

In an effort to overcome the default of his claim, Petitioner alleges that his post-conviction counsel was ineffective for omitting these claims from his amended post-conviction petition and invokes Martinez v. Ryan, 132 S. Ct. 1309, 1320 (2012). (Doc. No. 1, at 5–6.)  Before Martinez was decided, a prisoner could not demonstrate cause to excuse default by claiming that he received ineffective assistance of counsel during state post-conviction proceedings. See Coleman, 501 U.S. at 752-53.  In Martinez, the Supreme Court announced that the ineffective assistance of post-conviction counsel can, under limited circumstances and in states with procedural impediments to raising ineffective-assistance claims on direct appeal, establish cause for the default of a claim of ineffective assistance of trial counsel. Martinez, 132 S. Ct. at 1320; see also Sutton v. Carpenter,

745 F.3d 787 (6th Cir. 2014) (holding that <u>Martinez</u> applies in Tennessee). To overcome default under <u>Martinez</u>, a petitioner must show that post-conviction counsel was ineffective during the "initial-review collateral proceeding," <u>Martinez</u>, 132 S. Ct. at 1320, and that the underlying claim is a "substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." <u>Id.</u> at 1318-19.

The Sixth Circuit has provided the following framework to evaluate claims under <u>Martinez</u>:

> As to these claims, the district court should determine . . . : (1) whether state post-conviction counsel was ineffective, . . . and (2) whether [Petitioner's] claims of ineffective assistance of counsel were "substantial" within the meaning of <u>Martinez</u>, <u>Sutton</u>, and <u>Trevino</u>. Questions (1) and (2) determine whether there is cause. The next question is (3) whether [Petitioner] can demonstrate prejudice. Finally, the last step is: (4) if the district court concludes that [Petitioner] establishes cause and prejudice as to any of his claims, the district court should evaluate such claims on the merits. . . . [E]ven "[a] finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." <u>Martinez</u>, 132 S. Ct. at 1320.

<u>Atkins v. Holloway</u>, 792 F.3d 654, 660 (6th Cir. 2015) (some internal citations omitted).

Whether post-conviction counsel was constitutionally ineffective is necessarily connected to the strength of the claim he failed to raise, so "in many habeas cases seeking to overcome procedural default under <u>Martinez</u>, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was 'substantial' enough to satisfy the 'actual prejudice' prong of <u>Coleman</u>." <u>Thorne v. Hollway</u>, No. 3:14-CV-0695, 2014 WL 4411680, at *23 (M.D. Tenn. Sept. 8, 2014), <u>aff'd sub nom.</u> <u>Thorne v. Lester</u>, 641 F. App'x 541 (6th Cir. 2016). For the reasons that follow, each of Petitioner's ineffective-assistance claims is insubstantial and thus fails to overcome default under <u>Martinez</u>.

1. Claim 1(a)

Petitioner first alleges that his trial counsel was ineffective for failing to file a motion "for the production of witness statements that the State would be calling to testify given to law enforcement in connection to Petitioner's case." (Doc. No. 1, at 5.) He does not identify the specific witnesses at issue, describe the content of their statements to police, or explain how not moving for production of the statements prejudiced his case. Similarly, Respondent makes the blanket assertion that "All prior statements by state's witnesses were made available to the defense during discovery," without identifying the witnesses or statements or – more importantly – providing any citation to the record to support her statement. (Doc. No. 17, at 14.)

Petitioner's original *pro se* post-conviction petition complained that trial counsel did not have the victim's statement to police and was unable to impeach the victim with it at trial. (Doc. No. 16-19, at 40.) The Court therefore presumes that it is the victim's statement about which Petitioner complains now. But the transcript of counsel's opening statement at trial establishes her familiarity with the victim's previous statements, as when he told the jury to "listen for inconsistencies in what Mr. Brandon says, because you are going to hear that he said different things to different people at different times, not small differences, but fundamental differences about what happened," and said that the victim had previously described a perpetrator who "looks nothing like" Petitioner. (Doc. No. 16-4, at 24–25, 26.) Counsel then impeached the victim throughout his cross-examination by questioning him about multiple inconsistencies between his testimony and his previous statements to Officer Herndon and Detective Brennan. (Doc. No. 16-4, at 70, 72–74, 79, 83–84, 93–94, 100–102, 109–110, 114, 116, 119, 121, 124.) This record clearly establishes that there is no merit to Petitioner's claim that his trial counsel failed to obtain the victim's previous statements. Accordingly, this claim is not "substantial," and Petitioner fails

to overcome default under <u>Martinez</u>. <u>See</u> <u>Martinez</u>, 132 S. Ct. at 1318-19 (holding that a claim must have "some merit" to be substantial).

### 2. Claim 1(b)

Next, Petitioner complains of trial counsel's "failure to move for mistrial and/or dismissal of the indictments because the State allowed [the victim] to testify falsely, convict the Petitioner, and failed to have the State correct the false testimony." (Doc. No. 1, at 5.) Petitioner does not specify the testimony he alleges to be false, or provide any proof of its falsity. As the Court has already observed, counsel cross-examined the victim extensively about inconsistencies between his testimony and his previous statements. Counsel further questioned the victim about discrepancies between his testimony at the February 2011 trial and his testimony at a 2010 trial that had resulted in a mistrial, and even about conflicts in his testimony at different points that same day. (Doc. No. 16-4, at 86, 94, 113–14, 115, 122.) Possible explanations given for the victim's struggle to recall details consistently, other than dishonesty, were his previous stroke, his difficulty hearing and understanding questions, and his use of cocaine and alcohol on the night of his abduction. (Doc. No. 16-4, at 65–66, 73, 144.)

Counsel quite effectively demonstrated reason to doubt the victim's credibility, but that is not the same as proving that his testimony was false. "[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony," <u>Coe v. Bell</u>, 161 F.3d 320, 343 (6th Cir. 1998) (quoting <u>United States v. Lochmondy</u>, 890 F.2d 817, 822 (6th Cir.1989)), and do not provide a legal basis for counsel to seek a mistrial or dismissal, as another district court in this circuit has explained:

> Next, Petitioner claims that his attorney was ineffective in failing to request a mistrial when the victims perjured themselves. The trial court rejected this claim on the basis that counsel was not required to raise an objection to inconsistent testimony. Petitioner has not shown that the witnesses' testimony was false. The

> question of witness credibility is left to the trier of fact. <u>Macon v. Davis</u>, 450 F.
> App'x 491, 493 (6th Cir. 2011). Mere inconsistences in a witness's testimony do
> not establish that the testimony was perjured. <u>Id.</u> Counsel effectively cross-
> examined witnesses to highlight relevant inconsistences. Effective advocacy
> required no more. Counsel was not ineffective in failing to object to the witnesses'
> testimony.

<u>Pinder v. Tribley</u>, No. 12-CV-15527, 2015 WL 3916110, at *6 (E.D. Mich. June 25, 2015)

(denying habeas relief). Determining the credibility of a witness is the province of the jury, <u>U.S.</u>

<u>v. Beverly</u>, 369 F.3d 516, 532 (6th Cir. 2004); <u>Lorentz v. Deardan</u>, 834 S.W.2d 316, 320 (Tenn.

Ct. App. 1992), and Petitioner's jury credited the victim's testimony despite its imperfections.

This claim is not substantial for the purposes of <u>Martinez</u>. <u>See</u> <u>Martinez</u>, 132 S. Ct. at 1318-19

(holding that a claim must have "some merit" to be substantial).

### 3. Claim 1(c)

Third, Petitioner asserts that trial counsel was ineffective for failing to seek funds for a

fingerprint expert to assist with preparing cross-examinations about the state's fingerprint

witnesses' processes for processing and analyzing fingerprints, and to "answer the question why

the outer prints on the car did not match anyone else." (Doc. No. 1, at 5.) The record demonstrates

that counsel's strategy for cross-examining the prosecution's fingerprint witnesses was to elicit

acknowledgments that there were at least two prints on the victim's car (one on the lid of the trunk

into which Petitioner testified his kidnaper forced him and one on the driver's door) that did not

match either Petitioner or the victim (or anyone else in the law enforcement print database), that

fingerprints can last on surfaces for long periods of time (days or weeks, or "almost indefinitely"),

and that neither witness could say when or how a print came to be on the victim's car. (Doc. No.

16-5, at 49–50, 59, 72–76.) He later argued that those holes in the fingerprint evidence suggested

Petitioner was not guilty:

> If you can't place Mr. Church on the trunk or in the driver side, I would argue that that is something that you strongly need to consider in whether there is enough evidence there to actually convict him of closing that trunk lid, of getting in that car in the driver's side and driving off.

(Doc. No. 16-6, at 66.)  Petitioner does not explain why he thinks this strategy was deficient or what a fingerprint expert could have added that might have changed the outcome of his trial.  In the absence of such a showing, he has failed to establish that this claim is substantial. See Dykes v. Koster, No. 4:12 CV 2299 CDP, 2013 WL 6096887, at *5 (E.D. Mo. Nov. 20, 2013) ("Dykes did not present the testimony of an expert, nor does he now allege any expert that could have testified. Therefore, Dykes has failed to demonstrate his post-conviction counsel failed to raise a substantial claim of ineffective assistance of trial counsel.").

### 4.  Claim 1(d)

Petitioner claims that trial counsel was ineffective for failing to preserve for appeal a claim that the evidence was insufficient to support his convictions. (Doc. No. 1, at 5.)  Sufficient proof to satisfy constitutional due process has been defined as the "evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Jackson v. Virginia, 443 U.S. 307, 316 (1979).  The evidence is sufficient if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original).  When evaluating the sufficiency of the evidence, the Court must view the evidence in a light most favorable to the prosecution, id., and may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for the jury. See United States v. Jackson, 55 F.3d 1219, 1225 (6th Cir. 1995).  The testimony of the victim alone is sufficient evidence to support a conviction, see, e.g., United States v. Mejia, 909 F.2d 242, 245 (7th Cir. 1990); Swaizey v. Davis, No. 07-11776, 2009 WL 68652, at *8 (E.D. Mich. Jan. 9, 2009), even when the evidence is

inconsistent or of debatable credibility. United States v. Kenyon, 397 F.3d 1071, 1076 (8th Cir. 2005) ("Even in the face of inconsistent evidence, a victim's testimony alone can be sufficient to support a guilty verdict."); Tyler v. Mitchell, 416 F.3d 500, 505 (6th Cir. 2005) ("Tyler's insufficient evidence argument rests on an allegation involving witness credibility, which is clearly the province of the jury and not this court."); Martin v. Mitchell, 280 F.3d 594, 618 (6th Cir.2002) (noting that attacks on witness credibility constitute a challenge to the quality, but not the sufficiency, of the government's evidence).

The evidence against Petitioner at trial included not only the victim's in-court testimony, but his "100 percent" positive identification of Petitioner from a photo line-up, Petitioner's palm print on the victim's car, Petitioner's admission to Brewer that he had committed the crime, and evidence from Brewer and Petitioner's MySpace page establishing that a nickname overheard by the victim during his abduction was Petitioner's nickname. State v. Church, No. M2011-01770-CCA-R3CD, 2013 WL 2641338, at *2–7 (Tenn. Crim. App. June 10, 2013). This was ample evidence for a rational trier of fact to find Petitioner guilty. Accordingly, Petitioner's claim that counsel was ineffective for failing to raise or preserve the sufficiency issue is not substantial, because "counsel cannot be found ineffective for failing to raise meritless issues." Gratton v. McQuiggin, No. 2:09-CV-14782, 2013 WL 388591, at *7 (E.D. Mich. Jan. 31, 2013).

5.   Claim 1(e)

Finally, Petitioner claims that counsel was ineffective for not renewing a motion to suppress the victim's identification of him as the perpetrator after "trial counsel elicited testimony on cross-examination from the victim that he had given false testimony about the person that robbed and kidnapped him" with regard to his physical appearance. (Doc. No. 1, at 5.) On direct

appeal, the Criminal Appeals Court rejected Petitioner's claim that his pre-trial motion to suppress should have been granted:

> We acknowledge that the victim initially described his attacker at a black male who was 5'4" tall, weighing approximately 170 pounds, with black hair and long sideburns. However, the photographs in the line-up were of persons who were bald with goatees that appeared different from the description of the suspect provided by the victim. However, as pointed out by the State, this Court has held:
>
>> [A]ny discrepancy between [a victim's] initial description of the perpetrator and [a defendant's] appearance affects the weight of the evidence, not its admissibility. Indeed differences in [a defendant's] height and weight from the victim's description of the robber's height and weight should provide defense counsel with fertile grounds for cross-examination at trial ... [S]uch differences do not render the victim's pretrial identification of the [defendant] inadmissible.
>
> State v. Jeffrey Ray Jennings, No. E1999–00848–CCA–R3–CD, 2000 WL 274078, at *3 (Tenn. Ct. Crim. App. March 14, 2000). Furthermore, Detective Brennan instructed the victim to focus on the facial features of the subjects in the photographs rather than their hair. The victim was extensively questioned during cross-examination about the various discrepancies between the subjects in the photographs and his initial description of the suspect. Defendant is not entitled to relief on this issue.

State v. Church, 2013 WL 2641338, at *9–10. As the Court has already observed above, inconsistency does not equal perjury, and the state court correctly determined that discrepancies between a witness's initial description and a later identification do not make the identification inadmissible. See United States v. Crozier, 259 F.3d 503, 512 (6th Cir. 2001) (in-court identification of robber sufficiently reliable even though witness had described the robber as sixty pounds heavier, and witness earlier had been unable to describe the robber); United States v. Hill, 967 F.2d 226, 232 (6th Cir. 1992) (in-court identification admissible even though the witness had given an earlier inconsistent description). Petitioner's accusation of "false testimony" does not change this conclusion:

> The credibility of an in-court identification is to "be resolved ultimately by the jury after the defendant has had an opportunity to test the accuracy of an identification through cross-examination." <u>United States v. Allen</u>, 930 F.2d 1270, 1273 (7th Cir. 1991) (internal citations omitted). . . .. Thus, petitioner's counsel would not have been able to have Davis' in-court identification suppressed on the ground that she committed perjury. Moreover, petitioner's counsel extensively cross-examined Ms. Davis about . . . the discrepancies between her description of the perpetrator and the actual appearance of petitioner. . . .. Counsel was therefore not ineffective for failing to object to Davis' alleged perjured testimony, where counsel subjected Davis to an extensive cross-examination.

<u>Monroe v. Smith</u>, 197 F. Supp. 2d 753, 760–61 (E.D. Mich. 2001), <u>aff'd</u>, 41 F. App'x 730 (6th Cir. 2002).

Moreover, the discrepancies between the victim's initial description and Petitioner's actual appearance (in person and in the photograph used for the line-up) were already established before the victim took the stand and acknowledged them, and were already rejected as a basis to suppress the victim's identification of Petitioner. Because there is no reason to believe that a renewed motion at trial would have been found meritorious, Petitioner's ineffective-assistance claim is not substantial. <u>See</u> <u>Monroe v. Smith</u>, 197 F. Supp. 2d 753, 760 (E.D. Mich. 2001), <u>aff'd</u>, 41 F. App'x 730 (6th Cir. 2002) ("Trial counsel's failure to move to suppress this allegedly unreliable in-court identification would not be ineffective assistance, absent a reasonable probability that this motion would have resulted in a decision to exclude the testimony.").

Petitioner has not established that any of his ineffective-assistance claims have any merit, so they are not "substantial," as required to overcome their default under <u>Martinez</u>. Accordingly, Claim 1 will be dismissed as procedurally defaulted.

### B.      Claim 2

Petitioner also claims that the prosecution withheld the victim's statement to police, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and knowingly used the victim's false testimony to convict him. (Doc. No. 1, at 6.) Petitioner acknowledges that this claim is not

exhausted, but again blames the allegedly ineffective assistance of post-conviction counsel in excluding the claim from the amended post-conviction petition. (Doc. No. 1, at 6–7.) He asserts that he raised the claim in his original *pro se* post-conviction petition, and that counsel's later omission of it provides cause to excuse the default under Martinez v. Ryan, 132 S. Ct. 1309 (2012). (Id.) The law in this circuit is perfectly clear, however, that the Martinez exception is strictly limited to claims of ineffective assistance of trial counsel:

> We will assume that the Supreme Court meant exactly what it wrote: "Coleman[v. Thompson, 501 U.S. 722 (1991)] held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true *except* as to initial-review collateral proceedings for claims of ineffective assistance of counsel *at trial*." [Martinez, 132 S. Ct.] at 1316 (emphasis added).

Hodges v. Colson, 727 F.3d 517, 531 (6th Cir. 2013), cert. denied sub nom. Hodges v. Carpenter, 135 S. Ct. 1545 (2015), reh'g denied, 135 S. Ct. 2345 (2015). Accordingly, Martinez does not apply to claims of Brady violations and prosecutorial misconduct. Abdur'Rahman v. Carpenter, 805 F.3d 710, 714 (6th Cir. 2015).

Where the prosecution's withholding of evidence prevents a petitioner from presenting a Brady claim to state courts during post-conviction proceedings, that impediment itself constitutes cause for default of the claim. Smith v. Bell, 381 F. App'x. 547, 552 (6th Cir. 2010), vacated on other grounds sub nom. Smith v. Colson, 132 S. Ct. 1790 (2012)). But in this case it is clear that there was no impediment to Petitioner's asserting this claim on post-conviction, as he actually raised it in his *pro se* petition. (Doc. No. 16-19, at 41–42.) Accordingly, Petitioner has failed to establish cause to overcome the default of this claim, and it is barred from habeas review.

Moreover, as the Court has already found above in connection with Claims 1(a) and 1(b), trial counsel clearly had the victim's statements at trial and used them to cross-examine the victim,

and the victim's inconsistent statements do not establish that the prosecution knowingly presented false testimony.  Like Claim 1, Claim 2 is therefore without merit in addition to being defaulted.

## VII.    CONCLUSION

For the reasons set forth above, all of Petitioner's claims are procedurally defaulted, and alternatively fail on their merits under AEDPA.  Accordingly, the Court will deny the requested relief and dismiss the petition.

An appropriate Order shall enter.

WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE